IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

SE., a minor, by and through his next friend, Daniel Erck

    Plaintiff(s),

v.

Aspen School District 1

    Defendant(s).

## COMPLAINT WITH JURY DEMAND

Plaintiff, S.E. ("Plaintiff" or "S.E"), a minor, by and through his next friend and father Daniel Erck ("Father" or "Mr. Erck") hereby respectfully files this action against Aspen School District 1 ("Defendant" or the "District"), by and through counsel Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows. This action seeks injunctive and equitable relief, and appropriate damages and costs.

### I.  JURISDICTION

1. The Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331, 1341, and 1367.

2. Plaintiff is a resident of Colorado.

3. Defendant, Aspen School District 1, has its principal place of business in Pitkin County, Colorado.

4. Defendant, Denver Public Schools, has its principal place of business in Denver County, Colorado.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the Plaintiff occurred in whole or in part in Colorado.

## II.   PARTIES

6. Plaintiff is a minor student disabled within the meaning of Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*; and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-24-801 *et seq*.

7. The Plaintiff's disabilities include a Serious Emotional Disability ("SED"), Obsessive Compulsive Disorder ("OCD"), an unspecified anxiety disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), a Specific Learning Disorder with an impairment in reading (also referred to as Dyslexia), and a Specific Learning Disorder with impairment in writing.

8. Plaintiff's disabilities impair major life activities such as communicating, learning, and working.

9. Defendants are both recipients of federal financial assistance subject to the requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131, (1)(A), (B).

## INTRODUCTION

In 2021, the Plaintiff ("S.E.") and his parents, Daniel and Dara Erck ("Parents" or the "Ercks") moved Aspen, Colorado. Upon arrival, S.E. enrolled in the local school district, Aspen School District 1 ("Aspen"), at Aspen Middle School ("AMS" or "School"). During his time at AMS, S.E. experienced severe emotional and behavioral outbursts tied to his disabilities. Throughout this time, Aspen and the School attempted to provide S.E. with access to his

education, but lacked the capacity to safely, effectively, and non-discriminatorily address his disability needs. As a result, more often than not, Aspen and AMS responded to S.E.'s disability manifestations with increasing discipline. Aspen and AMS's responses further degraded S.E.'s already fragile mental health, causing his behaviors and fears to worsen rather than improve. Ultimately throughout the 2022-2023 academic year, S.E. spent more time confined in the principal's office than in his classroom. As a result, S.E. lost out on most of his education and developed severe traumas associated with his school and its administrators.

In late 2022, the Ercks identified Worldmind, a private, trauma-focused, school in Denver, Colorado as a possible treatment method. S.E. met with Worldmind staff on a trial basis over winter break 2022. In 2023, he enrolled and continues to receive his education there to the present date. Through Worldmind's 1:1, trauma-focused, approach, S.E. has regained emotional stability and independence and continues to heal.

## FACTUAL ALLEGATIONS

1. S.E. is a child disabled within the meaning of the ADA. He suffers from multiple disabilities including, as most relevant here, a Serious Emotional Disability ("SED"), Obsessive Compulsive Disorder ("OCD"), an unspecified anxiety disorder, and Attention Deficit Hyperactivity Disorder ("ADHD").

2. S.E.'s disabilities first emerged prior to 2017, and he qualified for special education services based on his disabilities in 2017.

3. At that time, S.E. was in first grade and his disabilities were not well understood. Initially, he qualified for special education solely through the category of a Specific Learning Disability ("SLD") based on deficiencies in reading, writing, math, attention, and executive functioning.

4. Over time, understanding of S.E.'s disabilities grew, and he qualified for special education under the additional category of an Other Health Impairment ("OHI") in 2018, through the specific diagnoses of dyslexia, anxiety, and ADHD.

5. In 2018, the Ercks moved from Maryland to New York, and S.E. enrolled at the Gateway School ("Gateway"), a dyslexia-focused primary school. However, Gateway's restrictive approach conflicted with S.E.'s emotional disabilities, leading the Ercks to transfer S.E. to the Lang School ("Lang") in 2020.

6. The Lang School is a twice-exceptional school focused on highly intelligent students with disabilities.

7. As part of his transition, S.E. completed an evaluation with Pediatric Assessment Learning & Support ("PALS") in January 2020.

8. The PALS evaluation noted significant elevations in S.E.'s aggression, depression, and adaptability. S.E. also displayed increasing anxiety, lowered frustration, and behavioral rigidity.

9. While S.E. was very intelligent,[1] his mental and emotional impairments strongly affected his access to education.

10. PALS recommended that S.E. go to a school with a small, supportive, class environment with educators individually aware and adaptable to his needs.

11. PALS specifically cautioned against placing S.E. in a traditional, community, school setting or with students with externalized anxiety or similar behaviors.

---

[1] PALS placed his full-scale IQ at 125, of the 95th percentile.

12. In May 2020, Lang accommodated S.E.'s needs and the PALS evaluation by providing S.E. full-time instruction from a special education instructor, in a small, two-teacher, classroom, with additional services such as counseling.

13. S.E. made significant progress at Lang. The school's 1:1 focus supported S.E. through his mental and emotional challenges, enabling him to access his education and excel.

14. However, not long after S.E. began at Lang, the COVID-19 Pandemic began, forcing a transition to online learning.

15. While S.E. continued to succeed academically, the transition denied him the benefits of his 1:1 mental and emotional support. As a result, S.E. eventually began to decline.

16. During the pandemic, the Ercks moved to Colorado and S.E. enrolled with Aspen School District ("Aspen") for the 2021-2022 school year.

17. At that time, S.E. had a GPA of 3.11, and high praise based on his participation and productive engagement in class and self-advocacy.

18. Initially, S.E. performed well in Aspen. Unknown to the Ercks at the time, S.E.'s special education teacher was providing him with specialized 1:1 instruction and support. With these additional services, S.E. performed well.

19. Despite adequate performance, S.E.'s 2022 IEP identified ongoing significant impairments in math, writing, attention deficits, and severe emotional distress.

20. Moreover, S.E.'s special education teacher left Aspen before the 2022-2023 school year, cutting off a vital source of support for S.E.

21. As the year began, S.E. continued to exhibit emotional dysregulation. In response, Aspen repeatedly attempted to punish S.E. by removing him from class and isolating him in the principal's office, among other measures.

22. Rather than improving S.E.'s behavior, Aspen's actions led to a dramatic worsening of S.E.'s symptoms. Now, not only did he lack emotional regulation, but he developed extreme anxiety about school and specific trauma about the principal's office.

23. As a result, S.E. became increasingly more erratic and out of control as the year progressed.

24. S.E.'s emotional outbursts became so significant that he gradually spent less and less time in his classroom and more time confined in the principal's office. The confinement also led to a denial of services including meeting with the school psychologist and his case worker.

25. Based on Aspen's failure to improve S.E.'s condition, the Ercks requested compensatory education services in March 2023. The Ercks requested the services to compensate S.E. for the education he lost due to being removed from the classroom.

26. As S.E. continued to worsen throughout the spring of 2023, Aspen significantly increased his special education services. However, despite the increases, S.E. continued to receive punishment for his disability manifestations, causing further anxiety and trauma, and exacerbating his emotional fragility.

27. In May 2023, Aspen also rejected the Erck's requests for accommodations including 1) 1:1 paraprofessional support at specified times during the school day; 2) compensation for outside tutoring services; 3) regular communication and updates

from S.E.'s teachers; 4) shortened or reduced assignment between special and general education; and 5) additional goals and services for developing social skills.

28. Aspen updated its service deliveries to S.E. through an individualized education program ("IEP").

29. S.E.'s 2023 IEP specifically noted that 1) S.E. was struggling academically; 2) S.E.'s prolonged confinement in the principal's office0 impaired his education; 3) S.E. struggled to access daily schoolwork; 4) S.E. struggled significantly with social and emotional needs, regulation, and engagement; and 5) S.E. began exhibiting self-harm.

30. Between May and June 2023, S.E. only received special education services on two days. Aspen also failed to ensure he received access to his counselor.

31. In August 2023, school resumed and the Ercks against petitioned Aspen for reasonable accommodations that would allow S.E. to access his education.

32. Among these was a request to transfer from one school counselor, "Andrea," to another, "Mel," because of anxieties and trauma's associated with Andrea from the year before.

33. Aspen denied the request.

34. The Ercks also requested additional in-classroom supports for emotional regulation, such as an extension to his existing 15-minute per day service allotment.

35. Mornings were particularly difficult for S.E. as they brought most of his triggers together into one moment. These included, arriving at school, passing the principal, seeing his classroom and teacher, and leaving his parents.

36. In the morning, several of these occurred at once, causing S.E. to experience severe anxiety at the beginning of each day.

37. The Ercks requested additional time for emotional regulation and delayed start times, all of which Aspen rejected.

38. Accordingly, S.E.'s disability manifestations continued to increase throughout the fall of 2023. In response, Aspen continued escalating its disciplinary responses.

39. For example, following an outburst on October 6, 2023, Aspen threatened to suspend S.E. for insubordination.

40. S.E.'s worsening behaviors led Aspen to conduct a functional behavior assessment ("FBA").

41. The FBA concluded that S.E. experienced severe emotional dysregulation symptoms, including crying, yelling, refusal of support, refusal to go to class, and expressing an intense need for his parents.

42. The FBA noted that S.E.'s behaviors progressively transitioned to defiance, disrespect, and avoidance of class, including increasingly disruptive behaviors such as banging on glass in the front office, cursing, kicking/throwing objects/chairs, and persistent requests to go home.

43. The FBA highlighted that S.E.'s behaviors continued to escalate and were developing into more significant forms of defiance and disrespect to school officials.

44. S.E.'s behaviors continued consistently throughout the day and required significant efforts to deter.

45. During the observation period, S.E. displayed dysregulated behaviors on 16/16 days. He also exhibited the behaviors for the entire duration of the school day on 15/16 of the observation days.

    46. The FBA concluded that S.E.'s behaviors were specifically related to separation anxiety from his parents, and when escalated, often, direct contact with his parents was the only strategy he could use to calm down.

47. S.E.'s separation anxiety coordinated with a severe response to the school environment. As the FBA noted, S.E.'s behaviors manifested in "immediate distress upon entering the school environment, independent of external stimuli, underscoring internalized distress."

48. To address these concerns, the FBA recommended multiple strategies for coping with S.E.'s disability manifestations and accommodating his disability needs. These included

   a. "[A] consistent routine for daily check-ins between S.E. and his parents to ease separation anxiety and preemptively address potential distress;"

   b. "[A] personalized transition ritual upon entering school to help S.E. ease into the day, possibly involving a trusted staff member or a calming activity;"

   c. "[A] range of flexible scheduling options, such as staggered start times, shorter class periods, or break between classes;"

   d. "[A]ccess to online learning resources or classes to accommodate when S.E. finds it challenging to attend in-person classes;"

   e. "[R]egular access to a designated mental health provider within the school environment;"

   f. "Offer[ing] S.E. opportunities to make choices throughout his school day . . . [to] demonstrate[] that his voice is valued and heard, and creating an environment where she [*sic*] feels empowered to express himself;"

g. "[A] gradual exposure or modified schedule plan . . .;"

49. However, despite the FPA, Aspen continued continued to react with disciplinary measures.

50. For example, on October 18, 2023, S.E. experienced an outburst, but was able to self-regulate. However, the Defendant sent S.E. home for the day despite his self-regulation.

51. Based on his escalating behavioral concerns, from October 19 through November 3, 2023, S.E. attended an intensive outpatient treatment program at Children's Hospital Colorado in Colorado Springs, designed to treat, evaluate, and provide recommendations for S.E.'s emotional disabilities.

52. Ultimately Children's recommended that S.E. receive significant support to allow him to access his education. Specifically, Children's recommended:

    a. Clear, consistent boundaries;

    b. Keeping S.E. at school rather than sending him home for behavioral issues;

    c. Dedicated academic supports for math outside of the classroom;

    d. A private, safe, space available for S.E. when he experiences dysregulation;

    e. Limited visible communication between the School and the Ercks (meaning that AMS should not call S.E.'s parents in front of him, as this could exacerbate his behaviors).

53. While Children's examined S.E., the Ercks were forced to stay in an AirBnB in Colorado Springs, at a cost of $1,516.09.

54. S.E. returned to school in mid-November 2023. However, he immediately displayed severe emotional dysregulation.

55. On multiple days, S.E. "cried loudly on and off for a majority of the day" or "spent considerable time . . . demanding [his parents] be called."

56. Accordingly, from August to December 2023, S.E. could not access his education nor any of the benefits of the Defendant's educational programs.

57. For example, S.E. did not receive a grade in French, Math, Science, or Social Studies in his 2023 Quarter 1 Report Card. Several of these teachers explained that S.E. did not receive a grade, because he did not spend enough time in class to complete the work necessary for a grade.

58. The Quarter 1 Grade Report also included a section for a more in-depth review of S.E.'s progress on academic standards. The section was left entirely blank.

59. To compensate S.E.'s education, between November 2022 and June 2023, the Ercks paid for $4,625 worth of outside tutoring services. S.E. continued to require these services throughout the fall of 2023.

60. At the end of fall 2023, the Ercks searched for options that could serve and accommodate S.E.

61. They identified Worldmind, a private, twice-exceptional school, in Denver, Colorado that specializing in trauma-informed education.

62. Worldmind focuses on children like S.E., who are exceptionally bright but suffer from a combination of other disabilities including severe anxiety, ADHD, and dyslexia, among others.

63. Structurally, Worldmind is more like Lang, S.E.'s previous New York school.

64. Worldmind combines outdoor-based education and small-classed indoor classrooms. Worldmind also provides 1:1 support as necessary with a variety of environments including outdoor spaces available as necessary for individual children's needs.

65. In late December 2023, Worldmind conducted a trial with S.E. and noted significant reduction in his behavioral dysregulation.

66. As a result, the Ercks enrolled S.E. in the program full time.

67. Worldmind's program has been transformative for S.E. For the first time since 2020, he received full 1:1 emotional support. With this support and alternative scheduling, S.E. was able to regulate his emotions and regain stability.

68. S.E. was even able to make friends and attend sleepovers without his parents, something that would have been impossible throughout his two years in Aspen.

69. Throughout his time in Aspen, the District continually aggravated and enhanced S.E.'s outbursts and anxiety.

70. By disciplining S.E. for manifestations of his disabilities, Aspen not only discriminated against S.E., but also worsened his conditions.

71. Because of Aspen's actions, S.E. suffered extreme emotional distress.

72. Aspen's discipline-based responses also chronically removed S.E. from class, denying him access to his education.

## LEGAL CLAIMS

### COUNT I

### DEFENDANT VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

73. Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

74. Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

75. Defendant Aspen School District is a recipient of federal financial assistance and operates public elementary and secondary education programs and activities. Therefore, it is a covered entity under 29 U.S.C. § 794.

76. The Plaintiff is a person with a disability within the meaning of 29 U.S.C. § 794.

77. Aspen intentionally discriminated against the Plaintiff by failing to provide him with reasonable accommodations.

78. Rather than accommodate the Plaintiff, Aspen repeatedly discriminated against the Plaintiff by punishing him and excluding him from participation in and denying him the benefits of Aspen's programs or activities solely because of her disability in violation of 29 U.S.C. § 794.

79. As a direct and proximate cause of Aspen's violation of Section 504, the Plaintiff has suffered and continues to suffer an total denial of education.

## COUNT II

**DEFENDANT VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 *et seq.***

80. Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

81. Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or actives of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (*see also* 28 C.F.R. Part 35).

82. Within the public entity context, to state an ADA claim, a plaintiff must establish "(1) they are qualified individuals with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the entity; and (3) such exclusion, denial of benefits, or other discrimination, was by reason of their disabilities." *Douglas Cnty. Sch. Dist. Re-1 v. Douglas Cnty. Health Dep't*, 568 F. Supp. 3d 1158, 1164 (D. Colo. 2021) (citing *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).

83. Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 12102.

84. Plaintiff possesses multiple disabilities which impair major life activities such as thinking, communicating, and working.

85. Aspen is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.

86. Aspen excluded the Plaintiff from participation in and denied him the benefits of its services.

87. Aspen's exclusion and denial was solely due to Plaintiff's disability.

88. Aspen's exclusion and denial was intentional.

## COUNT III

**DEFENDANT VIOLATED THE COLORADO ANTI-DISCRIMINATION ACT, C.R.S. § 24-34-801 *et seq.***

89. Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

90. The Colorado Anti-Discrimination Act ("CADA") affirms that it is the policy of the State of Colorado "[t]o encourage and enable…individuals with a disability to participate fully in social, employment, and educational opportunities… on the same terms and conditions as individuals without a disability" and "[t]hat…individuals with a disability must not be excluded, by reason of his or her disability, from participation in or be denied the benefits of the services, programs, or activities of any public entity or be subject to discrimination by any public entity." C.R.S. §24-34-801 (1)(a),(d). These rights are codified as a Civil Right in the Colorado Revised Statutes.

91. Aspen is a public entity subject to C.R.S. §24-34-801 *et seq.* per C.R.S. §24-34-301(5.4)(b).

92. The Plaintiff is an individual with a disability under C.R.S. §24-34-301(2.5).

93. Aspen discriminated against Plaintiff in the full utilization of or benefit from the services provide and rendered by Defendants due to the Plaintiff's disability.

94. Aspen intentionally discriminated against Plaintiff by totally denying him access to education.

## I.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests the following relief:

A.  Find that the Defendant violated state and federal law;

B.  Find the Plaintiff is the prevailing party;

C.  Award the Plaintiff equitable relief in amounts to be determined at trial;

D.  Award the Plaintiff compensatory damages in amounts to be determined at trial;

E.  Award the Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and/or other applicable statutes;

  F. Any other relief deemed necessary or appropriate.

*/s/ Conor O'Donnell*
Conor O'Donnell
Igor Raykin
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Suite 150
Aurora, CO 80014
Phone: 720-748-8888
igor@coloradolawteam.com
conor@coloradolawteam.com
**Attorneys for Plaintiff**